Mr. Baldwin and Henry. Good morning, Your Honors. David Baldwin, Potter Anderson and Caroon Wilmington, Delaware. For the appellants. I hope it's the afternoon. Is it the afternoon? Oh, sorry. We had about four cases this morning. That's enough. Judge Ambrose, I would like to reserve five minutes of our time. That's fine. We're here to appeal to appeal from a summary judgment ruling of the district court from the District of Delaware. Chief Judge Sleet ruled that as a matter of law, each of the three elements required under Delaware law for misrepresentation in a proof of law. And I take it your argument is that there's four elements. Is that right? Well, yes, Your Honor, there are four elements. There's an intent to deceive. But let's go just to get some facts out of the way. The Sixth Amendment to VIP's lease provided that the lease ended on March 31, 2004. That's a JA, I think, 302. During examination under oath, the operations manager, I guess Crowley or no, Patacio, confirmed that the lease expired on March 31, 2004. How could you say in 2007 that they were still leasing it and using it? Well, there are a number of responses to that, Your Honor. First of all, Mr. Patacio's testimony was not uniformly consistent with the other testimony. It was undisputed, and the district court found that there was a holdover tendency under Delaware law, and that holdover tendency continued on for a considerable time. I agree with you. Post-March 31, 2004, there was. But then there was. Pat Naro sent a letter to VIP that the lease was to be terminated, no ifs, ands, or buts, on May 6, 2005, and that Pat Naro expected VIP to vacate within 30 days. Your Honor, I would agree that from the point, at least, of when the keys were handed over and so forth, that it's not really tenable to argue that the property did not become vacant at that point. But the issue we're dealing with here has to do with the state of mind of the two people that worked on preparing this form. It's a considerably large organization. There are over 260 properties that were on just this one spreadsheet. But if the property became less than 31 percent vacant, then you can't make a claim with respect to rents, can you? I mean, this property was actually 100 percent vacant. I'm sorry. It had to be 31 percent used. If it wasn't 31 percent used, it was deemed to be vacant, and it looked like it was 100 percent unused on April 16, 2007. That's right, Your Honor. I would have to say the claim for rents was not well-founded. And so the issue is whether, under Rule 56 standards, it was appropriate for the district court to dismiss the case and find that there was no material fact concerning knowing falsehoods and intention to deceive and materiality. Because in the context of this case, the district court found that the Pettenaro people and entities, and they're not, you know, one unit. How much claim was made for the replacement value here? About $3.6 million, Your Honor. But is that really the replacement value for this building? It was a negotiated replacement value. When the policy was written, the parties negotiated for a square footage replacement value that would apply to all the properties. In fact, the record shows that Pettenaro changed from a prior carrier because the carrier wanted to increase the replacement cost. And Pettenaro's argument, which is in the record, is that we have a construction company. We can replace it for $50 a foot. And, in fact, that's what the parties negotiated. If the building is vacant, can there be any claim for insurance here? Yes, for insurance. Do you mean for rent? Well, not just for rent. Yes, for insurance. There's nothing that prohibits the insurance policy still provides for replacement cost coverage for this property. And the insurance company insisted upon getting the highest premium it could, and Pettenaro tried to keep it as low as possible by arguing for the lowest replacement cost. And once the building burned down, the insurance company is no longer willing to pay the specific replacement cost, which the parties negotiated. They negotiated over this point. But also, didn't the continental – well, I guess initially the fire marshal's people claimed or believed that there might be arson, and they investigated. And I thought the conclusion was that there was arson. Well, the conclusion was that – and this is part of what goes to the cross-appeal. The conclusion was that the fire was set by some human intervention, but the fire marshals at their – And that's arson, right? No. No, there has to be intent to damage a person or building under common law to be arson. What they said is – and this is part of what gave rise to our bad faith claim because it was an unorthodox and irregular theory of arson. They said if a homeless person was in there and using a tiki torch and trying to light his way and accidentally burned the building down, then that would be arson because the person would have been a trespasser and was not supposed to be there. But there's nothing in Delaware law or in the policy that defines arson as anything other than an intentional act. If you need four elements for a misrepresentation defense here, and the court misstated, the district court, and said that there were three and skipped intent to deceive, it would seem on the surface initially as if the intent to deceive is a factual issue that would call for a remand. But when you look at the other three and you look at what Judge Sleet wrote in his opinion, which I'll get to in a second, there's some case law going all the way back to an 1883 Supreme Court case that says if the facts are that clear, you can infer that this fourth element, even though a factual matter, has been taken care of. And the first thing, just to start with, Judge Sleet on page 11 of his opinion, he said the court concludes that no reasonable jury could find that Crowley and Verino-Petnero, who are sophisticated parties in the commercial real estate business, believe that a holdover tenancy existed due to the presence of items abandoned by BIP and had no knowledge of their own business records and correspondence regarding the status. What he's referring to there is that there were statements made on records in 06 and I guess 05 that they had abandoned, that there was a bunch of material left, but there was no intent to have anybody there. Well, the trier fact did not have a chance to evaluate this. There's nothing in the record that talks about whether Mr. Petnero and Mr. Crowley are sophisticated people, not that I'm going to complain that my client is unsophisticated, but there's no record basis for it. There's no record basis that they had any access to these particular documents. There's no record basis that Mr. Verino-Petnero was even still employed at the company full time as opposed to semi-retired. But he signed something, did he not? He did sign something, but the only way to find that that's a knowing and intentional misrepresentation is if he signed it with knowledge of all the facts. And there's been no showing of that. The Court just assumed that. And as you have ruled in the Justifen case, when you're dealing with an issue of an insured state of mind, it's not generally susceptible to being dispositive on summary judgment. And the only way you can assume one of the factors, as you mentioned, is if all the other factors are present. And take materiality, for example, here. There's no showing by the district court of how this is material or why it would be material. Can I just go back to the policy? I am lost because the policy which is governed by Delaware law contains, among others, these relevant provisions. One is Section 2, Part D. It says this policy excludes loss or damage directly or indirectly caused by resulting from any of the following, regardless of any other cause or event, whether or not insured, contributing concurrently or in any other sequence of the loss. And under J, it says any willful or dishonest act or omission of the insured. If a court determined that what happened is that there was a willful or dishonest act in terms of making this proof of loss, how could you have coverage? You're saying it's just limited, you wouldn't get rents. But how could you have any coverage? Well, I'm not saying you just wouldn't get rents. I'm saying that those are factual questions concerning the insured state of mind. The trial court had no way of knowing whether any of this was material, did not articulate how this would be material, number one, because all the information the insurance company had was provided to it by Pett and Narrow, and the court described that as overwhelming evidence. So the record suggests the insurance company would not have done anything different. And the case law – I'm sorry, can I ask you a question? Your adversary brought up in the briefs that during the course of this litigation, I suppose, they were shown documents and other information showing the, I guess, falsity of the proof of claim, yet they refused to amend it in any way. They seem to make a big deal about that. How do you respond? Well, that was pre-litigation. We weren't involved, but it doesn't seem to me to be a big deal. They're saying we're sticking to our guns because this is what we – as I read it, they're saying this is what we understood to be the state of affairs, and we didn't have access to these documents at the time. And I believe that if they had changed their story at the time, then the other argument would have been, well, then this proves you lied. They're saying we didn't lie. This is what we knew. This is what we – this is still our belief, despite being handed all these things. Mr. Baldwin, this is Judge Elvis, sir. I'm not sure that I understood your response to Judge Ambrose when he indicated that there is a line of cases which would indicate you don't have to prove intent to deceive. Specifically, it can be implied. How did you – I didn't follow your response to Judge Ambrose. Well, I apologize, Your Honor, if I was not clear. There is a line of cases that says that. Our view is that, in our brief, that that's not the current trend. But even if it is, that line of cases says that the other elements must be shown in order to find that you don't need intent. And in most of the cases that the insurance company cites, we're dealing with post-fact-finder decisions where a jury or a court has made a ruling and found each of the elements or except the intent one, and we don't have that situation here. So your answer is that's an issue for a fact-finder? Yes, Your Honor, and we also have a case under Delaware law that says that intent is a required factor under Delaware law. But even if it is not because of the couple of cases that are cited for – cited by the insurance companies, the insurance company needs to have established by the summary judgment standard that there's no factual dispute concerning the other elements in order for you to be able to imply the first element. Thank you very much. It sounds on the surface as if you have a point. There's a 1924 Delaware case, Delaware Supreme Court case, which says that intent to deceive with respect to a misrepresentation defense is one of the elements. There are four elements. Now, the case that I'm referring to, I said 1883, it's actually an 1884 Supreme Court case, C-L-A-F-L-I-N, Kaplan v. Commonwealth, and it's at 110 U.S. 81. It says, and if the matter were material and the statement falls to the knowledge of the party making it and willfully made, the intention to deceive the insurer would be necessarily implied, for the law presumes every man to intend the natural consequences of his acts. In addition, there's a number of appellate court cases, including the Ninth Circuit, which have picked up on that. So the question here is, is it so obvious as to the first three elements that one can, in effect, treat this like summary judgment and say there is no way conceivable I believe you could prevail with regard to your disputing this fact that here under this policy so much points to the evidence that the building was vacant, that there was arson, et cetera, and yet you're disputing that. I find that the fourth element is met or can be inferred without us going to trial. Well, Your Honor, the quote that you just made from the Claflin case is exactly what I was saying. It said if it be material and if there be an intent to deceive, you can get to the first element. But you have to show all the elements except the one. And materiality alone could not possibly be shown here, where the insurance company testified that they didn't know what differently they would have done if they had. If this goes back to Judge Sleet, do you think there's any chance you're going to get to a trial? Yes, Your Honor. You really do? I really do. Because none of these factors, each of these factors has to be proved in front of a fact finder, whether Judge Sleet or anybody. And the court, in a matter of intent, trying to read someone's mind, cannot make these factual findings without at least collecting evidence. Why don't we hear from Mr. Henry, and then we'll get you back up on your bucket. Thank you, Your Honor. Thank you. Good afternoon, Your Honor. Good afternoon. Your Honor, I would submit initially that the decision of the court below was well founded. There were, by my count, approximately 17 distinct issues of fact, based upon the documents submitted to the district court on summary judgment concerning the condition of the building, the knowledge of the insured concerning that condition, and those findings of fact can be clearly indicative of a ---- Could you clarify for me at the outset, in order to have insurance coverage, must the building be at least 31 percent used, at least unused? Yes, if there is a vandalism or an arson fire involved. That exclusion relates to 31 percent usage, and if there's not 31 percent usage, for customary operations, I would stress to the court, customary operations, then damage caused by vandalism or an arson fire is excluded. Was there a definitive finding made by the fire marshal with respect to arson? He found that the fire was incendiary. The Wilmington Fire Marshal's Office determined under the National Fire Protection Act guidelines and standards that the fire was a set fire, that human agency was involved. The ATF, Alcohol, Tobacco, and Firearms Investigator, Paul Gemato, determined that there was an incendiary fire. The private cause and origin investigator that Continental hired also determined that the fire was an incendiary fire. So, yes, on all three counts, there was no evidence to the contrary ever presented by the Petner Organization prior to the declination or prior to the litigation. So if the building was over 31 percent leased at the time of the fire on April 16, 2007, then despite the arson, you would have covered it? Yes, because it would not have met the definition of vacancy. Okay. That brings up another point. Is part of your defense misrepresentation in the insurance application? Yes, sir. That was an issue that was raised before Judge Sleet. It was not ruled upon by the court below. We had two bases. When you brought this up before Judge Sleet that there was misrepresentation, did you tell Judge Sleet or indicate that there were, under Delaware law, four requirements, including an intent to deceive? No. We cited two cases from Delaware, the Dixon case, which was a foot in the application case. We cited the Claflin case, which Your Honor referenced before, which is the standard essentially throughout the country in all the circuits for the question of an intent to deceive being inferred from a knowing and voluntary statement. The fine case in the Second Circuit followed that decision. The cases in the Eighth and Tenth Circuit have followed that decision. And I would suggest to the court that Judge Sleet did reference, although not directly, the state of mind and intent issue. On page 8 of his opinion, he cited this court's decision in just offense. He cited another decision from this court, the real case, which dealt with intent to deceive and questions of material fact. So I believe the court fully referenced the intent to deceive issue without specifically saying. I mean, the reason that we're having oral argument in this case is the court did not make a definitive finding that there was an intent to deceive. I think he did. I think he said no reasonable jury could conclude. Well, I quoted something on page 11, but, you know, is that really a finding? Is there something else you can find? Yes. The plaintiffs knew that no commercial tenant could use the property to conduct customary operations just before the fire. In addition, he said, he found that the testimony and averments about vacancy and the sworn proof of loss were false. He also found that the loss of rents claim was clearly material to the company's analysis of that claim. So it was a twofold finding by the judge, that the falsity of the vacancy, which they refused to admit, and, Your Honor, the record shows even at the examination of the role, if they were asked, in light of these facts, how can you say that you're entitled to a loss of rents or that the property wasn't vacant? So is your argument that they should have thereafter or shortly thereafter or right there amended whatever they had put in? Absolutely, Your Honor. And to go further, at the they in requests for admission, they admitted that their sworn testimony under Roeth was truthful without any attempt whatsoever in the record to withdraw it. Secondly, at the hearing before Judge Slee, not the hearing, I'm sorry, it was not a hearing, but the briefing before Judge Slee, no affidavits were filed with the court  Mr. Crowley didn't file one. Barrino Petnero didn't file one to say, hold on, we might have made a mistake on that loss of rents claim since the property was vacant for two years. We were owed $125,000 and we're really not entitled to loss of rents. Even if the property was found to be tenanted under Your Honor's questioning, the loss of rents claim was not a result of the fire. Although the loss of rents claim was minuscule compared to what was? It was minuscule if you listen to the Petnero's claim for the $3.6 million. As we've indicated in our filing. By the way, what did you have with respect to, what number did you come up with with respect to replacement value instead of the $3.6 million? The replacement value was, there was no dispute of the replacement value, Your Honor. The dispute was that the policy required replacement with like kind and quality for the same purpose and use. And this warehouse, which leaked, which was a death trap, which was an accident waiting to happen by their own evidence, was never to be replaced as a warehouse. An office building went in and it's our position that under the policy, that would only entitle them to actual cash value coverage, which is not replacement cost, it's well reduced. Somewhere in the $300,000, $400,000 range. So the fact is. In order to get replacement value, it had to be in use or what? It had to be, replacement of the property had to begin within one year with like kind and quality for the same purpose and use. So the functional equivalent, if a functional equivalent of a two-story warehouse was built, that's what, that's all it would have taken. But the record shows that was never anywhere in the ballpark, Your Honor. With respect to, if I may continue. Sure. With respect to the other questions of the knowledge and intent, I think the record before the court shows that when Mr. Crowley was questioned on DeRolf, there had been, we had questioned prior witnesses with respect to the condition of the property. He would not acknowledge that the property was really vacant, even in light of the terrible nature of it. He was. What you're saying now, this all goes toward, we're concerned about, can we infer an intent to deceive here? That's what you're answering, I assume, right? Yes, Your Honor. Partly. And then also the knowing, the knowledgeable nature of his testimony at the examination on DeRolf, which was, which is a separate violation of the concealment misrepresentation and fruit clause. He sat through Mr. Verino-Petnero's testimony at the exam and the records in front of the court show that, where the termination lease letters were marked as exhibits and they show right on the record on the first page of the examination on DeRolf. And so for him to come and say, I didn't know that the lease was terminated, which we refer to in our brief, is not true. He knew that. The record shows that. He listened to testimony concerning it.  I would suggest that the record certainly amplifies that. Mr. Henry, Mr. Henry, just help me out. Yes, Your Honor. This is an appeal from a granting of summary judgment. Is that right? Yes, Your Honor. All right. Summary judgment cannot be given if there is a question of fact. That's a sine qua non. And yet I'm hearing you challenging the words of witnesses in certain proceedings as if that is a question of fact for someone to find. Isn't that what you are saying, that although these words came out, they were not believable? I'm suggesting you're wrong with that. So I'm confused. I'm very confused whether you are challenging some of the facts that were presented in testimony and suggesting I don't know what you're suggesting. So just help me out. Yes, Your Honor. I'm not quarreling with the testimony of the witnesses. What I'm saying is that the record that, as found by Chief Judge Sleeth, shows that the quantum of evidence that existed necessarily means that that testimony was not true, nor was the claim true. I'm not getting into a swearing contest with the witness. I'm just saying that the record before the court below determined that no reasonable juror would believe that testimony in light of the overwhelming evidence of the condition and non-occupancy of the building, Your Honor. Are you quarreling with the findings or the, shall we say, the impression of the testimony of the judge, of the district judge here? No, Your Honor. We're not challenging the findings of Judge Sleeth at all. That's why I believe that he concluded in 15, 16 or 17 different factual statements that the condition of the building was such that no reasonable person would believe testimony to the contrary. But what the problem is, he cited a test that said you need a misrepresentation that's made knowingly and that's material. And he left out an element, the fourth element being and has an intent to deceive. I mean, I realize one could make an argument that knowingly has to mean intent to deceive, but that's not what the case law says in Delaware. Well, we're wrong, at least the Racklin case, R-A-C-H-L-I-N from 1924, talks about there being a fourth element. And I think, and I'll be glad to do it again, but I thought I kind of addressed that, Your Honor, from the standpoint that in Judge Sleeth's opinion he referenced state of mind and intent. So he referenced state of mind in terms of knowingly, the second prong, or intent to deceive, the fourth prong? The fourth prong. That's why I said he didn't specifically state the intent to deceive, but he referenced cases in his opinion that talked about the intent to deceive and state of mind, which were issues that he knew were there. And just like this court in Burkett made determinations under Pennsylvania law that when the records and documents that exist are so clearly one-sided that the court can infer an intent to deceive or bad faith from those documents. I mean, what he also says later on, on page 11 of his opinion, because the evidence demonstrates that the plaintiffs knew the property was vacant on the date of the fire, the plaintiffs are not entitled to claim actual damages or loss of, he just says here, rental income under the terms of the policy. And you're saying you don't get any coverage if the building isn't at least 31 percent leased and used? That's correct, under the arson vacancy exclusion. And that's why that made that testimony and those documents so important to the insurer, because the proof of loss said the property was tenanted to an ongoing business operation plus or minus 31,000 square feet or 45,000 square feet, which got them over the 31 percent threshold. Since the officials determined that the fire was an incendiary fire, then that would have been the only element, had they been up front from the start and said the property was vacant and we weren't leasing it. And plus we're not entitled to rents because we didn't lose any money, rental money. Any other questions? I guess I'm running out of time. Do you want to sum up? I would, Your Honor. In sum, I think that the record, the decision of Judge Sleet was fully supported by the record. I think the claim. Including on intent to deceive? Yes, I think, as I said, inferentially, yes, intent to deceive, because that can be inferred from Claflin, from Fine in the Second Circuit, from Cachow in the Seventh Circuit, the Tenth Circuit. If the facts are such that there would be no reasonable disagreement on their import, the intent to deceive can be inferred. Thank you. You're welcome, Your Honor. Mr. Baldwin, your opponents made the claim that, look, and I had said to you, if this goes back, do you really think that there won't be a finding of intent to deceive directly made? And you say, yeah, you believe that that's the case, that you will get to a trial. What makes you think that? Well, I think it's the totality of the circumstances, Your Honor. When we go back, Judge Sleet will obviously use the correct test, only once the record is developed concerning when you look at intent to deceive in the context of all the information that was provided by the Petten Arrows. Right from the beginning, one or two days after the fire, they started providing information on lease, on condition of the building, and volumes of the building. But if the building wasn't leased, that's the point. It was no longer in lease at the time, it was no longer used. They had a holdover. The holdover tenant got out in 2005, left a lot of debris, and among other things, your occupant ledgers from November of 2006 list the VIP as a former occupant and describe the tenancy as vacant and closed. I could go on and on. Yes, there's even testimony by some of the employees that it was vacant. But the issue is, does this show a guilty person who's trying to deceive the insurance company when they're completely forthright and they provided all the information? Well, that's the whole point that I think you're seeing through the lines of the district court opinion, that they were the opposite of completely forthright. Well, I don't think that's the way I'm reading Judge Sleet's opinion. Well, Judge Sleet said they provided overwhelming evidence of vacancy. They were completely cooperative. They didn't coordinate any employee testimony. I'm sorry. You mean they, who supplied? Petnaro supplied overwhelming information on vacancy? Yes, that's how the insurance company knew about it. They're the ones that provided pre-litigation, pre-coverage determination, all these documents that the court references. These documents were not determined during, were not. Well, if that's the case, how could they get any coverage for arson? Well, Your Honor, they don't, let me step to arson, let me set that aside for a second. But with respect to intent to deceive, the conduct of the pre-coverage determination conduct of the appellants shows that they were completely forthright with respect to all the ledgers, with respect to the lease terminations, with respect to all these memos that say they handed over the keys. That was all turned over. So if Mr. Petnaro When they filed a proof of loss, they claimed that the building was not vacant. Yes. So the court may find upon, or the fact finder may find that there was not adequate coordination between Mr. Petnaro and Mr. Crowley and all the documents in the case. But they said they didn't know about it. But on April 12th, when there was four days before the big fire, there was a minor fire. And didn't Mr. Petnaro's son, Gregory Petnaro, go out to the project, go out to the building? Yes, he did, Your Honor. He would have known then, right, you know, if he never knew before that the building was vacant. Well, there's no, he didn't go to determine the vacancy or non-vacancy of the property. But there's no evidence with respect to what he knew or didn't know about the vacancy in this record. There was testimony in the pre-litigation record. Wasn't there some duty on behalf of the company to amend that proof of loss? Well, I'm not sure, Your Honor. I don't really believe sitting here, I mean, I think what it looks, what the cases say is whether you made a misrepresentation at the time of the representation, whether that was an improper representation. I think that's what the cases say. And maybe that's what they meant in their testimony, that they honestly believed that. And based on what they knew, that's what they thought. So there's no way that without knowing how all the information flowed from Verino Petnaro, who owned it individually and is not a corporate entity, and the other parties in the case, there's no way that the Court can determine an intent to deceive without knowing how all the information flowed and whether it was innocent or not. We're conceding that it was vacant, but whether that was an intentional attempt to hoodwink the insurance company when the companies provided every single scrap of information that showed the building was vacant is hard to believe. If I knowingly supply you information and that information I know is inaccurate and therefore it is a misrepresentation, when do you cross the line from my knowing that to my intending to deceive you? Isn't it a very easy cross? Well, first you have to show that that was known and that you can, you know, there's not been any finding that you can impute all this information. Well, I think the district court basically said there was a misrepresentation, it was knowing, it was material. But he said that without having, when there are material disputes of fact about those points, and I'd like to just take arson for a second, Your Honor. There has not been a finding of arson in this case, and that's part of the basis for our bad faith claim. What did the fire marshal find? The fire marshal, when examined under oath, said he couldn't rule out accidental or negligent causes. And the alcohol, tobacco, and firearms officer said the same thing. He couldn't rule out accidental causes. And in each of these cases we found they had been meeting secretly with the fire marshals, and all the four Wilmington fire marshals lost their notes. Alcohol, tobacco, and firearms guy said he always keeps his notebook and fires it, files it with the file, and in this case he may have shredded it. So there were a lot of irregularities about the file. But the thing that makes it bad faith, especially is for the insurance company to claim there's an arson finding when it doesn't meet arson elements, arson elements. But you're not saying Continental could have influence over the fire marshal to make the fire marshal make a determination of arson or incendiary fire if there wasn't an arson or incendiary fire, right? The court allowed us to take discovery, which was stopped by this, and we don't know exactly the influence. But we know that all the reports, fire marshal, ATF, and the private origin and cause expert that Continental had came out with parallel language, in some cases identical language, and an identical theory that calls accidental fire an arson when there's no basis in the law to say that. It's based on an industry publication, and they stretch to coordinate their testimony. Thank you very much. Thank you. Thank you to both counsel for well-presented and well-argued cases. We'll take the matter under advisement.